AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

7/26/21

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

711 West Wenger Road, Apartment 217, Englewood,
Ohio 45322

)
)
)
)
)

Case No.    3:21MJ278

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Possession with Intent to Distribute Methamphetamine and Fentanyl and Conspiracy to Commit the Same |

The application is based on these facts:

See attached Affidavit of David M. Ashley

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

DAVID ASHLEY                    Digitally signed by DAVID ASHLEY
                                Date: 2021.07.26 16:27:17 -04'00'

*Applicant's signature*

SA David M. Ashley, DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____FaceTime_____ *(specify reliable electronic means).*

Date:  _____7/26/21_____

*Judge's signature*

City and state:  _____

Hon. Sharon L. Ovington, U.S. Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: 711 West Wenger Rd., Apartment 217, Englewood, Ohio 45322 | Case No. ___3:21MJ278___ |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR
A WARRANT TO SEARCH AND SEIZE**

David M. Ashley, a Special Agent (SA) of the Drug Enforcement Administration (DEA), United States Department of Justice ("hereinafter referred to as the Affiant"), being duly sworn, deposes as follows:

INTRODUCTION

1. I am an "Investigative or Law Enforcement Officer" of the United States Drug Enforcement Administration within the meaning of Title 21, United States Code, Section 878. As such, I am an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 878.

2. I have been employed as a Special Agent by the United States Department of Justice, DEA, since August 2009. I am currently assigned to the DEA Dayton Resident Office (DRO). In 2009, I reported to DEA Basic Agent Training in Quantico, Virginia. In August 2009, I completed the 19 week Basic Agent Training Academy at the DEA Justice Training Center in Quantico, Virginia. While attending Basic Agent Training, I received instruction on topics including narcotics identification, surveillance techniques, methods of operation of narcotics traffickers, law, evidence handling, undercover operations, current trends/patterns involving the distribution of narcotics, as well as other areas of drug enforcement.

3. During my career with the DEA, I have participated in multiple controlled substances

1

investigations, involving marijuana, cocaine, heroin, methamphetamine, fentanyl, and prohibited pharmaceuticals. I have investigated financial crimes to include; money laundering, structuring habits, and bulk cash smuggling. I have interviewed numerous subjects/defendants involved in and/or arrested for drug violations and I have participated in several joint interagency federal and state investigations. Additionally, I have supervised the use of confidential sources; conducted physical surveillance; and monitored/reviewed recorded conversations of drug traffickers. I have participated in multiple Title III investigations by monitoring lines, supervising monitors, and conducting surveillance to substantiate the Title III interceptions. During the course of these interceptions, I have become familiar with coded terminology utilized by drug trafficking organizations to disguise their illegal activities and the manner in which they conduct these illegal activities. Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the activities of drug smugglers and drug trafficking distribution networks including the use of communication facilities such as the United States Post Office and FedEx to ship both narcotics and United States Currency associated with the narcotics trafficking activities. During the conduct of my official duties, I have authored various affidavits to include, but not limited to: search warrants and criminal complaints.

4. I am participating in an investigation conducted by agents of the Drug Enforcement Administration (DEA) and other agencies, into drug distribution activities of Justus RUBY and others, in Dayton, Ohio and its surrounding communities. I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation, conclusions I have reached based on my training and experience, and upon information I believe to be reliable from the following sources:

    A. Physical surveillance conducted by federal and local law enforcement agents, the details of which have been reported to me either directly or indirectly;

    B. Information developed from undercover investigators and cooperating sources;

    C. Public records;

    D. Controlled purchases of methamphetamine by undercover officers; and

E.  Recovery of physical evidence.

5.  This affidavit is intended to show that there is sufficient probable cause for the above-described search warrant for 711 West Wenger Rd, Apartment 217, Englewood, Ohio 45322., ("TARGET RESIDENCE"), and does not purport to set forth all of my knowledge of, or investigation into, this matter. The facts and information in this affidavit are based on my personal knowledge, my training, and my experience.

## FACTS SUPPORTING PROBABLE CAUSE

6.  The United States, and the Drug Enforcement Administration (DEA) is conducting a criminal investigation of Justus RUBY and any other co-conspirators known and unknown regarding possible violations of 21 U.S.C. §§ 841(a)(1) and 846 (possession with intent to distribute methamphetamine and fentanyl and conspiracy to commit the same).

7.  In September 2020, a DEA confidential source (hereafter referred to as CS[1]) provided information to investigators stating a friend provided him/her a phone number associated with Robert WALKER (WALKER), stating it is used by an individual identified as "Rob".  The CS further stated his/her friend indicated Rob can sell methamphetamine or "meth".

8.  On October 22, 2020, the CS, as witnessed by law enforcement conducted a series of text messages and calls to and from WALKER.  The purpose of the communications were to establish a controlled purchase of approximately three ounces of meth for the negotiated price of approximately $1,600.00.

9.  During the telephonic communications, WALKER indicated numerous times that the CS and task force officer, acting in an undercover capacity (UC1) needed to pick

---

1 The CS previously cooperated for judicial consideration in his/her unrelated judicial case.  The CS has provided information that has been reliable and corroborated through investigative efforts.  The CS's criminal history includes: driving under the influence and obstructing official business, domestic violence and assault, possession and trafficking of narcotics, and money laundering.

WALKER up and take him to his source of supply (SOS). As a result, investigators canceled the attempted controlled purchase on that date. Subsequently on the same date, UC1 established telephonic communication with WALKER.

10. On October 23, 2020, UC1 re-established telephone communications with WALKER. During said conversations, WALKER again indicated he needed to be picked up to meet with the SOS. During the communications, WALKER advised he wanted paid for his part of the deal. As a result, UC1 negotiated a meeting between WALKER, UC1, and another task force officer, acting in an undercover capacity (UC2) near WALKER's apartment complex at 124 Chestnut St., Englewood, Ohio.

11. On October 23, 2020, UC1 and UC2 met with the person named Robert WALKER. During the meeting, WALKER provided UC1 phone number, 937-607-7477, stating it belonged to, "Jose". Soon after, telephonic communications were established between UC1 and the user of 937-607-7477. On October 23, November 10, November 20, and twice on December 29, 2020, undercover agents purchased methamphetamine and during each instance, the undercover agents have negotiated with user of phone number 937-607-7477. Of relevance for the instant warrant, methamphetamine was purchased from Justus RUBY on January 29, 2021.

12. On January 29, 2021, UC1 established telephonic communications with 937-607-7477. On this date, UC1 purchased methamphetamine from Justus RUBY. During early surveillance, investigators observed RUBY, wearing dark jeans and a purple hoodie, exit his apartment at 711 W. Wenger Rd., #217, Englewood, Ohio[2] (TARGET RESIDENCE). RUBY entered a white Chevrolet Equinox, North Carolina license plate, HEW2793, registered to Avis Budget Rental, and depart. A subsequent Administrative Subpoena to Avis revealed RUBY as the renter of the Equinox on this date. Surveillance was maintained on RUBY and the Equinox as it traveled to the apartments of Kensington Square Apartments, 700 Keswick Cir. Trotwood, Ohio. Prior to arriving at Kensington Square, telephonic contact was made between RUBY and UC1, wherein, RUBY told UC1 he was grabbing the, "Shit" for UC1. In the

---

[2] A prior administrative subpoena indicated that RUBY resided at 711 W. Wenger Rd., #217, Englewood, Ohio.

4

aforementioned apartment complex, investigators observed RUBY stop and park in a small lot on the southwest side of the Kensington Square Apartments. At the Kensington Square Apartments, it is unclear to investigators if RUBY had exited the Equinox. The area where RUBY was parked was later determined to be in the immediate area of 715 Hallworth Place, Trotwood, Ohio.

13. Subsequently on the same date, RUBY departed the area of 715 Hallworth Place, Trotwood, Ohio and surveillance observed the Equinox meet car door to door with UC1 and another law enforcement officer, acting in a undercover capacity (UC3), in the area of 101 W. Worley Ave., Trotwood, Ohio. Per UC1, it was at that time, the driver of the Equinox proceeded to exchange the negotiated three ounces of suspected methamphetamine in an exchange for $1,400.00. Per UC1, during the exchange, he/she did not positively identify RUBY as the driver of the Equinox; however, UC1 observed the driver as a black male wearing a purple hoodie. Following the transaction, surveillance lost visual of the Equinox for a short time before reestablishing visual back at RUBY's apartment, TARGET RESIDENCE. At the apartment, investigators observed RUBY wearing the previously mentioned purple hoodie, exit the Equinox and enter his apartment building through the south side communal door.

14. On the same date, the suspected meth was transported to the Dayton Resident Office where it field tested presumptive positive for meth and was subsequently submitted to the Northcentral Laboratory for analysis and storage.

15. On May 17, 2021, UC1 re-established telephonic communications, via text, with 937-607-7477, for the purpose of establishing a future purchase of meth.

16. On May 27, 2021, law enforcement with the assistance federal search warrant authorized GPS location data for 937-607-7477, conducted surveillance. At approximately 10:14 a.m., the GPS location data placed 937-607-7477 in the area of Kensington Square Apartments, 700 Keswick Cir. Trotwood, Ohio, with an approximate radius of 1,058 m. Prior to that GPS update, the GPS location data placed 937-607-7477 during the early morning hours in the area of RUBY's apartment,

TARGET RESIDENCE at varying ranges including, but not limited to: 443 m., 653 m., 719 m., and 593 m.

17. Law enforcement established surveillance on the Kensington Square Apartments situated on the southwest side of the complex. Subsequently, law enforcement observed RUBY and a second individual, who appeared to be WARFIELD[3], wearing a yellow over black jacket, exit apartment #715 and depart in a black Ford Edge, Ohio license plate, JJF8641, registered to PV Holdings Corp. The apartment address is 715 Hallworth Pl., Trotwood, Ohio. A subsequent Administrative Subpoena to PV Holdings Corp. revealed RUBY as the renter for the Edge. On the same date, during an ongoing text messages between UC1 and the user of 937-607-7477, the user told UC1, "Jus cum tomorrow my bro gone get u right". Your Affiant knows the conversation was in regard to purchasing meth. Additionally, based on the surveillance observations and data gleaned from the GPS locates for 937-607-7477, your Affiant believed RUBY to possess the target phone on that date.

18. On May 28, 2021, UC1 continued to negotiate the meth purchase with the user of 937-607-7477. During a series of conversations via text, UC1 told the user of 937-607-7477 that he/she wanted some, "Cream", which is coded language for meth. UC1 further advised he/she possessed, "1500". The user of 937-607-7477 later affirmed, stating, "Yea come on". Soon after, law enforcement received a GPS locate for 937-607-7477 in the area of Kensington Square Apartments, 700 Keswick Cir., Trotwood, Ohio, with an approximate radius of 961 m. Based on the GPS location data, investigators established surveillance on 715 Hallworth Place, Trotwood, Ohio. During a series of exchanged telephonic communications, the user of 937-607-7477 continued to direct UC1 where to travel in order to conduct the meth purchase. Subsequently, investigators observed two black males, one wearing the same yellow over black jacket, mentioned in the previous paragraph, exit the 715 Hallworth Place, Trotwood, Ohio and enter a black Jeep Grand Cherokee. Surveillance was lost on the Cherokee soon after it departed the 715 Hallworth Place, Trotwood, Ohio. A few minutes later, a black Jeep with two black males met with UC1 in an area just north of

[3] During the investigation of RUBY and others, law enforcement has purchased methamphetamine from Warfield. This controlled drug purchase occurred on October 23, 2020.

the intersection of Wolf Creek Pike on Seybold Rd., Trotwood, Ohio and exchanged approximately three ounces of meth for $1,500.00. During the meet, UC1 observed what he/she believed to be a North Carolina license plate on the Jeep. According to UC1, he/she observed the passenger wearing a yellow and black shirt. Surveillance again was lost on the Jeep following the exchange. The conversations in this paragraph are not all inclusive nor verbatim.

19. Subsequently, the suspected meth was transported to the Dayton Resident Office where the item field tested presumptive positive for meth and were subsequently submitted to the Northcentral Laboratory for analysis and storage.

20. On June 8, 2021, law enforcement conducted surveillance at 715 Hallworth Place, Trotwood, Ohio. During surveillance, law enforcement observed a black male, with a black t-shirt and a left forearm black tattoo, later identified on June 9, 2021 as J'Juan BAILEY, via an Ohio driver's license photo, exit 715 Hallworth Place, Trotwood, Ohio and enter a gray Toyota, Florida license plate, KCKR83, registered to EAN Holdings LLC. Law enforcement contacted EAN Holdings LLC, Law Enforcement Relations, requesting the renter information for the Toyota. EAN Holdings identified BAILEY of 5958 Leafridge Ln., Columbus, Ohio as the renter of the Toyota.

21. Additionally, law enforcement identified BAILEY's Ohio driver's license number as TY686713. Using the driver's license number, law enforcement located a driver's license photo of BAILEY which law enforcement associated with the driver of the Toyota, mentioned in in the previous paragraph. On the same date, law enforcement contacted EAN Holding LLC, Law Enforcement Relations, requesting all vehicle rental information for BAILEY from May 1, 2021 to June 6, 2021. EAN Holdings indicated BAILEY had rented a black Jeep Cherokee, North Carolina License plate, JAS4029, from May 14, 2021 to June 2, 2021. This would coincide with law enforcement observations during the drug transaction on May 28, 2021 that a black Jeep with possible North Carolina license plate sold UC1 meth.

22. On July 14, 2021, at approximately 10:19 a.m., law enforcement received a GPS locate for 937-607-7477, indicating the phone was in the area of RUBY's apartment,

TARGET RESIDENCE, with an approximate radius of 593 m. Based on that, law enforcement established surveillance on the apartment. Parked in the lot was a black 2021 Chevrolet Malibu, Ohio license plate, JHR1471, registered to PV Holdings. A subsequent Administrative Subpoena submitted to Avis Budget/PV Holdings revealed RUBY as the renter for the Malibu. Shortly after, law enforcement observed RUBY wearing a white t-shirt, gray pants, and a black do-rag head covering exit the south side entrance of his apartment, enter the Malibu, and depart. Surveillance was maintained on RUBY as he traveled to 715 Hallworth Place, Trotwood, Ohio. At approximately 11:05 a.m., law enforcement observed RUBY back into a spot near the front door of the 715 Hallworth Place, Trotwood, Ohio, exit the Malibu, and enter 715 Hallworth Place, Trotwood, Ohio. A few minutes later, law enforcement observed RUBY exit 715 Hallworth Place, Trotwood, Ohio and depart in the Malibu. The Malibu traveled west on Shiloh Springs Rd. and then south on Seybold Rd., Trotwood, Ohio. Your Affiant observed the Malibu on the side of the road facing northbound. The Malibu was parked beside a light-colored SUV with an Indiana license plate, driven by an unknown white male, facing southbound. Your Affiant observed the plate to be NJB983; however, a law enforcement database check from the plate returned negative for a registered owner. Investigators surmise your affiant misread the plate. Additionally, your Affiant observed, a south facing blue Chevrolet Cobalt with Indiana license plate, 669DFO, on the southbound berm, driven by a white female with three other occupants in the vehicle.

23. Immediately, your Affiant observed the Malibu depart from the SUV then turn around and go south bound on Seybold Rd. The light-colored SUV turned around northbound and departed the area. Surveillance was not maintained on the light colored SUV. Investigators then observed the black Malibu park in the middle of the roadway beside the blue Cobalt. Based on your Affiant's training and experience, the nature of the case, and prior dealings with RUBY, your affiant believes that he was observing car-to-car drug transactions.

24. Your affiant continued to Wolf Creek Pike and turned around then headed back northbound on Seybold Rd. At or around that time, your affiant observed the blue Cobalt still parked on the side of the street and the Impala had departed the area. Your

8

affiant continued to Shiloh Springs Rd. and waited for the Cobalt to return northbound. A short time later, your affiant observed the Cobalt drive west on Shiloh Springs and surveillance was initiated on the Cobalt at that time. Simultaneously, law enforcement re-established surveillance on the Malibu as it traveled east on Shiloh Springs Rd. Law enforcement maintained surveillance on the Malibu as it returned to the 715 Hallworth Place, Trotwood, Ohio. A few minutes later, law enforcement observed RUBY exit the Malibu and enter 715 Hallworth Place, Trotwood, Ohio. At that time, law enforcement terminated surveillance at the 715 Hallworth Place, Trotwood, Ohio to assist law enforcement in surveilling the Cobalt.

25. On the same date, pursuant to your Affiant's observations wherein, the Malibu conducted two brief vehicle car to car meets, your Affiant contacted Ohio State Highway Patrol (OSHP) Trooper Jerrod White, who was on patrol in the area of highway 70, requesting assistance on a traffic stop of the Cobalt. According to your affiant, the request to traffic stop the Cobalt was derived from your Affiant's training and experience wherein the brief door to door meets can often be associated with drug transactions. At approximately 11:50 a.m., Trooper White conducted a traffic stop on the Cobalt in the area of mile marker 3, highway 70, near New Westville, Ohio. During the traffic stop, Troopers White and Kyle Pohlabal, who had arrived to support Trooper White, removed four occupants from the vehicle and verbally advised said occupants of their *Miranda* rights. Subsequently, the front passenger of the Cobalt, admitted to possessing a, "Ball of Fetty" in her underwear. Based on training and experience, your Affiant knows the term, "Ball" is used to describe an eighth of an ounce and, "Fetty" is short for fentanyl. The front seat passenger further indicated that they had purchased the suspected fentanyl for $200.00, from a black male, known as Jose. At that time, the front seat passenger willingly transferred the suspected fentanyl to investigators.

26. Additionally, the driver of the Cobalt indicated they had met with a black male identified as Jose[4], wearing a black do-rag, driving a black car. The driver further stated Jose provided his phone number of 937-607-7477 to the driver during the meet. At that time, the driver consented to law enforcement to review the contents of her

---

[4] On October 23, 2020, UC1 and UC2 met with the person named Robert WALKER. During the meeting, WALKER provided UC1 phone number, 937-607-7477, stating it belonged to, "Jose".

phone. Law enforcement observed a contact in her phone identified as, "Jose D Town" associated with 937-607-7477. Both the driver and front seat passenger advised the deal with "Jose" was set up before they left Indiana. They did not provide more information as to who set up the deal.

27. Following the encounter, all four occupants were released pending further investigation. The suspected fentanyl was transported to the Dayton Resident Office where it field tested presumptive positive for fentanyl and was later submitted to the Northcentral Laboratory for storage and analysis.

28. On July 26, 2021, UC1 placed a series of recorded phone calls and text messages to/from Justus RUBY who was utilizing 937-607-7477. UC1 and RUBY in a coded conversation agreed to meet later that day for the purpose of UC1 buying $1,500 of methamphetamine. Shortly thereafter, DEA surveillance observed Justus RUBY leave the TARGET RESIDENCE, enter a vehicle and depart the area. The vehicle was stopped for window tint violation, and it was found RUBY was in possession of the target telephone, 937-607-7477, and with a key that was later proven to open the apartment, 715 Hallworth Place, Trotwood, Ohio. During the vehicle stop, RUBY was provided his Miranda warnings by law enforcement. RUBY waived his Miranda rights and agreed to answer questions of investigators. RUBY stated that he had a key to 715 Hallworth Place, Trotwood and he would frequent there for social reasons. RUBY provided investigators with the key to the apartment at 715 Hallworth Place, Trotwood, Ohio.

29. On July 26, 2021, DEA Dayton Resident Office executed a federally authorized search warrant on 715 Hallworth Place, Trotwood, Ohio. In the apartment, law enforcement located a cloth bag with a digital scale and an empty bag with residue under the sink of the first-floor bathroom. Law enforcement also located multiple bags of suspected methamphetamine in the kitchen. Several of these bags were prepackaged as if for individual sale. A later field test of the suspected methamphetamine resulted in a positive presumptive field test. Investigators located a handgun in the master bedroom upstairs.

30. Later on July 26, 2021, Law enforcement interviewed Justus RUBY and again advised him of his *Miranda* warnings. RUBY stated that he was willing to answer questions without an attorney present. Further, RUBY stated that he lived at the TARGET RESIDENCE. RUBY stated that there was a handgun located in the master bedroom. Law enforcement further noted that the RUBY was in possession of target telephone, 937-607-7477, and it was in good operation. This is the same phone that UC1 had contacted on July 26, 2021, for the purpose of organizing a narcotics purchase.

31. In summation, your Affiant believes the TARGET RESIDENCE is being utilized to house illegal substances, drug proceeds, and criminal documents. On July 14, 2021, Justus RUBY was observed by law enforcement leave the TARGET RESIDENCE for the purpose of conducting narcotics transactions. And, on January 29, 2021 RUBY was observed arriving at the TARGET RESIDENCE shortly after distributing controlled substances to UC1. These UC purchases are referenced above in this affidavit. As such, your Affiant believes based on training and experience that RUBY and other co-conspirators utilize the TARGET RESIDENCE to house illegal substances and drug proceeds.

32. Your Affiant knows based on training and experience in drug investigations that traffickers often maintain in their residences and other locations from which they conduct their drug trafficking activity, controlled substances, books, records, receipts, notes, ledgers, and other papers relating to the procurement, distribution, storage and transportation of controlled substances to include records showing the phone numbers and/or pager numbers of suppliers or customers, and other criminal associates. They frequently maintain receipts such as credit card billings, telephone bills and toll records, parking stubs, hotel reservations/records, airline tickets, gas receipts and various notes. They possess items used to package controlled substances. It is also common for these drug traffickers to maintain electronic devices, to include but not limited to, mobile telephones, computers, paging devices, answering machines, police scanners and money counters to facilitate their criminal activity. These items are commonly maintained in locations to which drug traffickers have frequent and ready access, i.e. homes, apartments, businesses and automobiles.

11

33. It is common for drug traffickers to conceal narcotics, narcotics records, narcotics proceeds and other related items described above within their businesses, residences, and automobiles; with their criminal associates; or with other trusted individuals in order to conceal such items from law enforcement authorities.

34. Persons engaging in drug trafficking commonly conceal large amounts of currency, financial instruments, precious metals and other items of value. It is common for drug traffickers to purchase items costing over ten thousand dollars. In doing so, traffickers will often violate federal structuring laws (Title 31, U.S.C. Sections 5324) by obtaining several cashier's checks and/or money orders in small increments from several institutions. Traffickers often utilize agents or "smurfs" to purchase these checks or money orders, the purchase of which generates receipts. The proceeds of drug transactions, and evidence of financial transactions relating to the obtaining, transferring, secreting or spending of large sums of money gained through engaging in narcotics activities is often found in the trafficker's residences, businesses, automobiles and other locations maintained for the purpose of concealing their activities.

35. Your Affiant knows that narcotics traffickers often purchase and/or title assets and open accounts, such as utility accounts, in fictitious names, aliases, or the names of relatives, associates, girlfriends or business entities to avoid detection of these assets and accounts by government agencies. Even though these assets and accounts are in names other than the traffickers', the narcotics traffickers actually own and continue to use these assets and accounts and exercise dominion and control over them.

36. Persons engaged in drug trafficking often take or cause to be taken photographs and/or videotapes of themselves, associates, drug proceeds or property derived from the proceeds derived from the sale of controlled substances. Traffickers usually maintain these items in their possession.

37. Your Affiant is aware, based on my training and experience that drug dealers frequently maintain firearms and weapons to protect both the controlled substances and proceeds derived from their sales. Drug traffickers maintain firearms as a use of force, or threat of force, against rival drug dealers and/or delinquent customers.

12

38. Based upon the information contained in this affidavit, your Affiant believes that there is probable cause to believe Justus RUBY and others, known and unknown, are involved in a conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Your Affiant asserts that there is probable cause to believe evidence of that violation, along with the fruits and/or instrumentalities of these offenses are located at the TARGET RESIDENCE.



DAVID ASHLEY  Digitally signed by DAVID ASHLEY
Date: 2021.07.26 16:28:08 -04'00'
_____
David M. Ashley, Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me on this 26th day of July, 2021.



_____
Sharon L. Ovington
**United States Magistrate Judge**

## Attachment A

The place to be searched is 711 West Wenger Rd., Apartment 217, Englewood, Ohio.  711 West Wenger Rd., Apartment 217 is a brown brick with vinyl upstairs two story apartment.  The entrance to #217 can be accessed from a red south side locked communal door. There is a staircase inside the south communal door that accesses apartment #217.  The apartment is located north of Wenger Road and is on the west side of the apartment complex.  711 W. Wenger Rd #217, Englewood, Ohio 45322 is further depicted in the following photograph.



**ATTACHMENT B**

**PROPERTY TO BE SEIZED**

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. §§ 846 and 841(a)(1), possession with intent to distribute methamphetamine and fentanyl, including, but not limited to:

A.      Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B.      Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C.      Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D.      Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E.      Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F.      United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G.      Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H.      Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I.      Contraband, such as illegal drugs and other materials, paraphernalia and/or equipment and tools used in the drug trade, including heat sealing equipment.

J.      Firearms and ammunition.